leading to the Floyds' apartment was lighted by the Floyds. Prior to the repairs, the light upon the stairs had been maintained by the tenants. During the repairs, for two or three months, the plaintiff had been allowed to occupy her rooms rent free, but had begun to pay rent again, and when the hall was wired and the repairs finished the landlord was to light the hall. The rear stairway opened into a lane, and the Floyds, their visitors, and the other tenant who did not move out, used that stairway, at least until the new stairs were up.

The plaintiff and Mrs. Baxter were visiting the Floyd apartment. They entered during the daytime, and were frequent visitors, and knew well the conditions. They left the Floyd apartment after dark, Mrs. Floyd accompanying them. In going down the stairs Mrs. Baxter fell against the plaintiff, causing her to fall, and causing the injury complained of. Mrs. Baxter says:

"Mrs. Hicks went down a few steps ahead of me, down the steps. I was walking on her right along the wall. My feet struck, stepped on something that gave way with me. I felt for the step with my left foot, and my heel caught in something in the stairs, and threw me downstairs."

There was upon the landing a doorframe, but it is evident that it did not cause Mrs. Baxter's fall, as the frame was found in its correct position, and therefore did not give way. Apparently she slipped upon the plaster, or shavings, or some other substance that littered the stairway, and her foot caught the opening between the riser and the temporary tread; the opening being two or three inches. It is therefore evident that the doorframe had nothing to do with the accident, except that it was an additional warning to the parties, as to the general condition of the stairway and the building, that the stairway was not intended for general use, but was in the hands of the carpenters. The plaintiff evidently knew of the back entrance, as the evidence indicates her frequent visits to the apartment, and unless she shut her eyes when she entered the Floyd apartment she must have seen that she was taking chances in using the stairway in that condition. She took the same chances that any person takes in going into a building which is being built or repaired, and in attempting to use the temporary stairs which are intended for the use of the workmen.

I favor an affirmance.

---

(158 App. Div. 206.)

In re WATER SUPPLY OF CITY OF NEW YORK.

Appeal of STEWART.

(Supreme Court, Appellate Division, Third Department.    July 8, 1913.)

1. EMINENT DOMAIN (§ 134*)—COMPENSATION—MEASURE.

A sand bank upon land condemned for a reservoir site, prior to the location of the reservoir, was practically worthless. Since the location of the reservoir, and because of the demand for sand in the construction of same, the sand bank was made valuable. *Held*, that it was proper to consider such value in fixing the value of the property condemned.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 356; Dec. Dig. § 134.*]

2. EMINENT DOMAIN (§ 205*)—COMPENSATION—SUFFICIENCY OF EVIDENCE.
    Evidence in condemnation proceedings *held* to show that $4,500 was
adequate compensation for a sand bank.
    [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 544;
    Dec. Dig. § 205.*]

Appeal from Special Term, Columbia County.

Eleanor I. Stewart appeals from an order of the Columbia County
Special Term confirming an award of the commissioners fixing the
amount of compensation for property condemned for the water supply
of the city of New York. Affirmed.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD,
and WOODWARD, JJ.

Griggs, Baldwin & Baldwin, of New York City (Martin Conboy, of
New York City, of counsel), for appellant.

Archibald R. Watson, Corp. Counsel, of New York City (William
McM. Speer, of New York City, of counsel), for respondent.

JOHN M. KELLOGG, J.   The order appealed from awards $11,-
020 and costs for about 50 acres of land appropriated, of which about
32 acres were ordinary farming lands, with the buildings and improve-
ments thereon, and about 18 acres were a sand bank, which was of but
little value for agricultural purposes, and the sand had no market val-
ue in the bank prior to the location of the Ashokan Reservoir in the
vicinity.  $7,500 is a liberal award for the 52 acres of land taken, in-
cluding the buildings and improvements thereon, making no allowance
for the sand taken from the property by the city.   The farm will be
covered by the reservoir and was condemned for flowage purposes.
Prior to the location of the reservoir the 18 acres in question, the sand
bank, was of but little value.   Since the condemnation the city has tak-
en from the Stewart-Winchell sand bank about 134,000 yards of sand,
which has been used in making cement for use in the construction of
the dam.   The completion of the work as contemplated will require
about 250,000 yards more.   The Stewart-Winchell bank, so called, con-
tains about 70 acres of sand; but the sand used by the city has been
taken from the Stewart property.   There are several other sand banks
within the properties condemned for reservoir purposes.

[1, 2] The appellant contends that the demand for sand in building
the dam has given this sand bank a value of about 10 cents per yard,
and the amount contained in the bank is estimated at 742,000 yards.
Apparently after the demand of the city is supplied there will be no de-
mand for sand in that locality, and the sand bank will then be of little
value compared with the remainder of the farm.   While the sand bank
had no value prior to the location of the reservoir, the fact that large
quantities of sand would be required thereafter in constructing the
dam undoubtedly gave this sand bank some value, and such value was
proper to be considered in fixing the value of the property taken.   It
is clear that, if a sand bank had been located immediately outside of
the reservoir, the location of the reservoir would have added materially
to the value of that bank, if there was not a surplus of sand in the lo-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cality. A purchaser desiring such property would necessarily have to pay a value enhanced by the fact that there was soon to be a market for sand in the locality and that it was the only available supply. The same rule would apply where the sand is located upon property to be condemned.

The contents of the Winchell part of the sand bank is not definitely shown, but on nine other parcels of land taken, aside from the Stewart and Winchell property, are sand banks of greater or less extent. It is evident, therefore, that with the increased demand for sand in the locality for this special purpose the supply was so much in excess of the demand that the sand in the bank had but little value. The commissioners, as we view the evidence, have allowed about $4,500 more than the value of the property aside from the sand, and we are satisfied that an adequate compensation has been given for the property, considering the demand for sand in the locality.

The order should be affirmed, with costs. All concur.

---

### STOLTS v. BLAISDELL.

(Supreme Court, Appellate Division, Fourth Department. July 8, 1913.)

Appeal from Special Term, Chautauqua County.

Action by Charles Stolts against William B. Blaisdell. From an interlocutory judgment for defendant, plaintiff appeals. Affirmed.

Argued before KRUSE, P. J., and ROBSON, FOOTE, and MERRELL, JJ.

Hall & Van Vlack, of Cherry Creek, for appellant.
Stearns & Thrasher, of Fredonia, for respondent.

PER CURIAM. Interlocutory judgment affirmed, with costs, with leave to plaintiff to plead over within 20 days upon payment of the costs of the demurrer and of this appeal.

FOOTE, J. (dissenting). If two causes of actions are stated in the complaint, I think they are claims arising out of transactions connected with the same subject of action, within the meaning of subdivision 9 of section 484 of the Code, and so may be united in one action.

Plaintiff's claim is that he had a right to occupy defendant's 10 acres of land and raise crops thereon for the seasons of 1911 and 1912; that this was the agreement between the parties; that by mutual mistake in drafting the lease, such right was not given to him for the second season; that several months after the lease was made it was, in effect, modified by an oral agreement that 3½ acres of this land should be occupied and cultivated for the season of 1911 by defendant for his own benefit, but that defendant should harvest his crops on this 3½ acres and remove all roots and rubbish therefrom early enough in the fall of 1911 to permit the plaintiff to plow that land in the fall of 1911 to prepare it for crops of the season of 1912; and that this the defendant failed to do, thereby causing plaintiff damage